WhitaKEe, Judge,
concurring:
I agree that the payments to employees under the plan of the bylaw are not deductible as compensation for services rendered, because the payments were made in proportion to stock ownership and not in relation to the value of services rendered.
I would not decide the question of reasonableness.
JoNes, Chief Judge, joins in the foregoing concurring opinion.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Marion T. Bennett, makes the following findings of fact:
1. Plaintiff, R. J. Reynolds Tobacco Company, is a corporation organized in 1899 under the laws of New Jersey. It is engaged in the business of buying leaf tobacco and processing and manufacturing it into tobacco products, namely, cigarettes, smoking tobaccos and chewing tobaccos, and selling such products. Its executive offices and principal manufacturing plants are located in Winston-Salem, North Carolina. Its accounting year is the calendar year, and it keeps its books of accounts and files its income and excess- *17 profits tax returns for calendar year periods and on the accrual basis of accounting.
2. Within the time required by law, plaintiff filed with the collector in North Carolina its corporation income tax returns and its excess-profits tax returns, for the years so required by law, disclosing the following amounts of taxes due for each of the years indicated:

The above amounts were paid to the collector by plaintiff on or about the statutory installment dates fixed by law and were accepted by the collector as having been duly paid. By reason of the amended return for 1946, showing a larger amount of tax due than on the original return, plaintiff paid interest in the amount of $1,583.27.
3. Subsequently, as a result of various adjustments affecting the income or excess-profits tax liabilities of plaintiff, which adjustments were agreed to by the Commissioner of Internal Revenue and plaintiff, the following deficiencies in tax were paid by plaintiff, and the following overassessments of tax were credited or refunded to plaintiff for the years indicated:

*18 Postwar refunds of excess-profits tax were allowed as follows:
Year 1942_$779, 762. 52
Year 1943_ 171,195. 58
4. Taking into account the taxes paid as set out in finding 2 and the adjustments set forth in finding 3, the adjusted total taxes paid were as follows for the years indicated:

5. On March 13, 1950, and within the time required by law, plaintiff filed with the collector its claims for refund of income and excess-profits taxes, including claims for statutory interest, for each of the years 1940 through 1948, as follows:

The basis for each claim for refund was that payments made to employees under article xix of its bylaws, hereinafter generally called “the bylaw,” were deductible or otherwise allowable in computing tbe net income of plaintiff for the taxable year covered by the claim. In its claims, plaintiff *19 stated that such payments fell within one or more of the following categories:
(1) A reasonable allowance for compensation for personal services actually rendered, within the meaning of Section 23 (a) of the Internal Revenue Code;
(2) An ordinary and necessary business expense incurred during the taxable year in carrying on the business of the taxpayer, within the meaning of Section 23 (a) of the Internal Revenue Code;
(3) A part of the cost of goods sold by the taxpayer during the taxable year, in determining the gross income of the taxpayer under Section 22 (a) of the Internal Revenue Code. See Reg. Ill, Sec. 29.22 (a)-5.
Such payments were not claimed as deductions or as part of the cost of goods sold in its income tax returns or excess-profits tax returns for any of the years 1940 through 1948. Nor have such payments been allowed as deductions or as part of the cost of goods sold as a result of any adjustments heretofore made in determining the income tax or excess-profits tax liabilities of plaintiff for such years. Such payments were not claimed as deductions or as part of the cost of goods sold in plaintiff’s income tax returns for the excess-profits tax base period years 1936 through 1939, nor have such payments been allowed as a result of any adjustments of such returns.
6. There are some discrepancies between the records of plaintiff and the district director regarding the dates of payments of the amounts set out above, which dates would become material in computing interest on refunds in the event it was held that plaintiff is entitled to recover anything in this action. The parties have stipulated that in case of a finding in favor of plaintiff, they will endeavor to reach an agreement as to the proper computations on the basis of the findings, such computations to be used as a basis for the judgment. If there are disagreements the disputed matters will be submitted to the court for determination.
7. As a result of events occurring after its claims for refund were filed, including the adjustments referred to in finding 3, and certain deficiencies in income tax for 1942 and 1943, which are admitted by plaintiff to be due if its *20 claims for refunds of excess-profits tax for the same years are allowed, the tax refunds claimed in this suit by plaintiff are shown by the following schedule:

No part of such refunds claimed by plaintiff has been refunded, credited, set off, or otherwise allowed by defendant to plaintiff.
8. It has been stipulated that if the court finds and holds that plaintiff is entitled to recover all or part of the amounts sued for in this action, the parties will attempt to reach an agreement as to the amounts recoverable and, if they should so agree, they will file a stipulation with the court showing the amounts recoverable on the basis of the findings and conclusions of the court and in the event of a dispute the matter will be submitted to the court for determination.
9. The Commissioner of Internal Revenue, by registered letters under date of July 9, 1952, notified plaintiff that its claims for refund for each of the years 1940-1948 were disallowed in full.
10. The claims for refund and the disallowance thereof by the Commissioner of Internal Revenue constitute the basis of this suit. All conditions precedent to the maintenance of this suit by plaintiff have been performed or have occurred.
HISTORY OP PLAINTIFF’S COMMON STOCKS
11.When the bylaw, described more fully hereafter, was adopted in 1912, plaintiff had only one class of stock outstanding, 75,250 shares of common stock, $100 par value. Later in 1912 it issued 24,750 additional shares. At the end of 1912, the common stock outstanding consisted of 100,000 *21 shares, having an aggregate par value of $10,000,000. Up until the end of 1948, the only changes made in the common stock of plaintiff were a split of four shares for one, accompanying a reduction in the par value to $25 a share in 1920, and a further split of two and one-half shares for one, accompanying a reduction in par value to $10 a share in 1929. These reductions in par value increased the number of shares of common stock outstanding to one million, having an aggregate par value of $10,000,000.
12. In 1918, plaintiff issued a class B common stock, $100 par value, in the total amount of 100,000 shares, having an aggregate par value of $10,000,000. In 1920 each share of the class B common stock was exchanged for four shares of new class B common stock, $25 par value. The new class B common stock was also changed by a split of two and one-half shares for one, accompanying a reduction in par value to $10 in 1929. At times pertinent in this case, the new class B common stock had the same rights and privileges as the old common stock, sometimes hereafter referred to as class A common, except that it was not eligible for participation under the bylaw and it had no vote.
13. Stock dividends in the new class B common stock were distributed in 1920 to the holders of common stock and new class B common stock at the rate of 200 percent, in 1922 at the rate of 33% percent and in 1927 at the rate of 25 percent.
14. As a result of these capital changes affecting the B common stocks, the new class B common stock outstanding during the years 1940-1948 consisted of 9,000,000 shares of $10 par, an aggregate par value of $90,000,000. One million shares of class A common were outstanding during this same period.
15. The total amount of capital paid to plaintiff on account of its A common and B common stocks was $20,000,-000, $10,000,000 with respect to the A common and $10,-000,000 with respect to the B common.
16. Plaintiff never received any greater amount of paid-in capital on account of the common stock participating under the bylaw than it received with respect to common stocks of both classes not eligible for participation under the *22 bylaw. Some common stocks of plaintiff during each of the years 1940-1948 were held by persons not eligible to participate under the bylaw.
17.The following schedule sets forth the number of A common and B common stockholders of plaintiff and the total of such stockholders for each of the years 1940 through 1948:

HISTORY OP PLAINTIFF’S BYLAW AND COMPETITORS’ PROFIT-SHARING PLANS
18. The four principal tobacco companies which emerged from the dissolution of the so-called American Tobacco Company trust in 1911 as a result of the decision in United States v. American Tobacco Company, 221 U. S. 106, were The American Tobacco Company, Liggett & Myers Tobacco Company, P. Lorillard Company (hereinafter called American, Liggett and Lorillard), and plaintiff.
19. In 1912, but prior to August of that year, American, Liggett and Lorillard adopted bylaws providing for participation in profits by certain of their officers. Each of these bylaws provided that beginning with 1912 ten percent of the annual net profits of the company in excess of a base amount, estimated as the net profits earned during 1910 by the part of the business belonging to each company after the dissolution of the tobacco trust, should be paid to the president and five vice presidents of the company in the proportion of one-fourth to the president and one-fifth of the remainder to each of the five vice presidents. The payments were denominated salary for the year in addition to the fixed salary of each of the officers. Lorillard adopted an additional bylaw providing for a distribution of five percent of its net profits, above the same base amount, among *23 such employees other than the president and vice presidents, as the board of directors should determine and in the amounts determined by the board. None of these bylaws as originally adopted provided for participation in profits on the basis of stockholdings.
20. On August 2, 1912, plaintiff through its secretary, George W. Coan, addressed a circular letter to all of its stockholders, enclosing a notice calling a special meeting of stockholders to take action on a proposed bylaw. The first two paragraphs of the letter are as follows:
After full consideration, the Board of Directors have determined that the interest of the Company and all of its stockholders will be materially advanced by encouraging its officers and employes, a number of whom are now stockholders, to invest in its stock and to be thus more closely identified with its affairs.
To promote this cooperation, it is proposed that, beginning with the year 1912, all of the officers and employes of the Company who have owned its stock and been in its employ for not less than twelve months be allowed, at the option of the Board of Directors, to participate, in proportion to the stock thus owned, in the annual profits, if any, earned by the Company, in excess of profits earned during the year 1910, not exceeding in the aggregate 10% of such excess.
21. The following is the text of a letter dated August 8, 1912, from B. J. Beynolds, president of plaintiff, to the stockholders, further explaining the proposed bylaw:
In answering a few of our stockholders, with reference to the plan for promoting the further cooperation of its officers and employes in advancing the interests of the Company and all of its stockholders, as set forth in recent notice of Stockholders’ Meeting, to be held August 23rd, some of the questions that have been asked suggest information, given below, which other stockholders will doubtless be pleased to have.
The profits of the Company for the year 1910 were 22.19% of its $7,525,000 capital stock and were taken as a basis because the calculations on businesses and brands for 1910, as shown in the plan submitted to the Court by The American Tobacco Company and others, were, in effect, those upon which the dissolution was based. Profits for 1910 have likewise served as a basis upon which other companies interested in the dissolu *24 tion have, this year, formulated and adopted By-Laws providing funds, not exceeding 10% of excess profits, for distribution among certain of their officers.
The proposed By-Law to be considered and acted upon by the stockholders will provide, in detail, that the funds for distribution among officers and employes holding stock must not exceed 10% of those profits of the Company which are in excess of 22.19% of its entire outstanding issue of common stock, taking into account the proposed new issue of $2,475,000, when made..
Employes, as well as officers, holding stock, will be allowed to participate in the funds to be created; but the distribution will only be made in proportion to that stock which has been bona fide owned by the officer or employe for one year prior to the date of distribution. This will be a check against speculation on the proposition and will also be an inducement for its valued officers and employes, 48 of whom are now stockholders, to become permanently interested in the Company as such.
22. The bylaw proposed by the board of directors of plaintiff was adopted at the special meeting of stockholders held on August 23, 1912. The number of shares of common stock, $100 par value, outstanding at the time of -the meeting was 75,250. The number of shares represented in person and by proxy at the meeting was 45,423, all of which were voted in favor of the adoption of the bylaw. This bylaw, designated article xiii, provided as follows:
Participation by Officers and Employees in Certain Profits
All of the Company’s Officers and Employees who have owned its stock and been in its employ for not less than twelve months, may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate, in proportion to the stock thus owned, in the Company’s Annual Profits which are in excess of the percentage of profits earned during the year 1910, to-wit: 22.19%, not exceeding, however, 10% of those profits, in excess of 22.19%. of its entire outstanding issue of common stock, taking into account pro rata, any increase or decrease thereof, made during the year.
23. In 1915, after a 1913 amendment of plaintiff’s certificate of incorporation to authorize the issuance of preferred *25 stock and the sale of some preferred stock in 1915, article xiii of the bylaws of plaintiff was amended to read as follows:
Participation by Officers and Employees in Certain Profits
All the Company’s officers and employees who have owned its Common Stock and been in its employ for not less than twelve months, then next preceding may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate in proportion to the Common Stock thus owned, in the Company’s annual profits which are in excess of the percentage of profits earned during the year 1910, to wit: 22.19%, not exceeding, however, 10% of those profits in excess of 22.19% of its entire outstanding issue of Common Stock, taking into account pro rata any increase or decrease thereof made during the year. The Common Stock owned by an officer or employee, for the purpose of this By-Law, beginning with the year 1916, shall include any stock purchased during the year from an officer or employee or from the personal representative of a deceased officer or employee, provided such stock would have entitled the former owner to participate in proportion thereto had it been held for the entire 12 months’ period.
24. Article xiii of the bylaws was renumbered article xii by action of the board of directors in 1929. Thereafter, the bylaw remained in effect and unchanged until it was again amended in 1949. The bylaw in effect during the years 1940 through 1948, under which the payments at issue were made, was the bylaw as amended in 1915 and renumbered in 1929, quoted in full in the finding above.
25. American, Liggett and Lorillard had profit-sharing bylaws in effect during the years 1940-1948. American’s original bylaw was still in effect. While Liggett’s original bylaw had been amended to reduce the fund from ten percent to five percent of defined profits, the payments were still restricted to the designated officers. In the case of Lorillard, the bylaw in effect was one adopted in 1921 to supersede the two bylaws" adopted in 1912. It was entitled Bonus to Officers and Employees and provided for distribution of 15 percent of the annual “net profits” of the company among officers and employees who had been in the employ and *26 owned common stock of the company for the entire year “as an extra dividend upon and in the proportion among such officers and employees of such shares of Common Stock thus owned by them respectively.” Net profits were consolidated profits after deducting interest on bonds, dividends on preferred stock, $1.50 per share on common stock, and seven percent of surplus for the year. The percentage of issued common stock eligible for participation was limited to three and one-third percent in the case of the president, two percent in the case of the vice presidents, one percent in the case of certain other key personnel, and one-half of one percent in the case of any other officer or employee.
26. The plaintiff issued and sold some preferred stock for the first time in 1915 and has had preferred stock outstanding from time to time thereafter. Effective beginning in 1915 the plaintiff adopted the practice of deducting from annual profits the dividends accrued on its preferred stock in determining the amount of the participation payable under the bylaw. This practice was never approved by the stockholders or directors of the R. J. Reynolds Tobacco Company in a formal manner. American, Liggett and Lorillard had made specific provisions for such deduction in their profit-sharing bylaws as adopted in 1912 and as thereafter amended. This practice of the plaintiff resulted in a reduction of the amount of participation received each year when preferred stock was outstanding. For the years here involved, preferred stock was outstanding from 1945 through 1948 and preferred dividends in the following amounts accrued and were paid:
1945__$765, 984
1946_______ 1, 764, 000
1947___ 1,764,000
1948___ 1, 994, 608
27. On January 1, 1934, plaintiff owned 200,000 shares of its common stock which it had acquired, at a cost of $10,120,000, for sale to its employees but had been unable to sell because of the depression. Plaintiff had established in 1929 retirement and group insurance plans for its employees, providing retirement and disability benefits, group life insurance, total and permanent disability insurance, and *27 accident and health, insurance. By resolution of the board of directors adopted January 1, 1934, effective December 31, 1933, plaintiff established an account on its books known as the Retirement and Insurance Investment Fund. The resolution provided that the income from such 200,000 shares of common stock, after providing interest on the balance of plaintiff’s investment in such stock, should be used in defraying the expense to plaintiff of carrying the retirement and group insurance plans and that any surplus at the end of each year should be applied as a reserve toward the reduction of plaintiff’s investment in such stock. The resolution further provided that in order to build up a reserve to reduce the investment, the 200,000 shares of stock should be added to the number of shares qualified for participation under the bylaw in arriving at the per share distribution to qualified employees, beginning with the distribution under the bylaw for the year 1934. The effect of this arrangement was to reduce by about one-fourth the amount per share distributable to employees and to apply that amount toward defraying the cost of the stock and the expense to the company of the employee benefit plans mentioned. By the end of 1948, as a result of building up such reserve, plaintiff’s cost of the 200,000 shares of stock had been reduced to SI.
28. On December 6, 1917, January 9, 1919, December 31, 1943, June 14, 1945, and December 9, 1948, respectively, plaintiff’s directors adopted resolutions generally authorizing plaintiff’s officers to renew notes or continue loans with servicemen previously in the employ of plaintiff who had given notes for loans for the purchase of participating stock, where it appeared reasonably probable that these employees would continue in plaintiff’s employment after their discharge from the service, and also generally to permit such employees to participate in the participation payments during the periods they were in the service.
29. The amount set aside and distributed by the plaintiff under the bylaw for each of the years 1912 to 1948, inclusive, was the maximum percentage of plaintiff’s profits which could be so set aside and distributed under the provision of the bylaw, subject to deductions of preferred dividends as set out herein and subject to deductions on account of the *28 200,000 shares of common stock in the retirement and insurance investment fund.
30.The total participating payments made by the plaintiff to its own employees under bylaw xii, for the years 1940 to 1948, inclusive, are set forth in the following table. In finding 45 this information is supplemented and is broken down by categories of employment.

These amounts were exclusive of participation on stocks held in the retirement and insurance investment fund.
31. Glenn Tobacco Company, a wholly owned subsidiary of plaintiff, is a North Carolina corporation organized in 1922. It is engaged exclusively in the purchase of leaf tobacco in foreign countries for plaintiff. For the years 1940-1948, Glenn filed separate income tax returns. During the years 1940-1948 Glenn’s capital stock outstanding was $25,000. By agreements between plaintiff and Glenn, the annual net earnings of Glenn were limited to six percent of the capital stock, or $1,500 a year. During such years, plaintiff furnished Glenn with all funds on open account to cover all the expenses and costs of acquiring foreign leaf tobaccos. The portion of the $1,500 annual profit of Glenn remaining after payment of Glenn income taxes was regularly paid to plaintiff as a dividend. Employees of Glenn Tobacco Company who owned common stock of plaintiff have participated under the bylaw since the organization of Glenn, although the bylaw makes no specific reference to Glenn employees.
32. The total participating payments made by plaintiff under bylaw xix to employees of Glenn Tobacco Company, for the years 1940 to 1948, inclusive, are as follows:

*29

33. Participating payments under bylaw xn were authorized for the years 1940-1948, inclusive, near the end of each year by separate resolution of plaintiff’s board of directors and the payments were made in each case to participating employees in January of the following year. Checks were sent directly to the employees by plaintiff. Eegular dividends, however, were disbursed quarterly by plaintiff’s dividend disbursing agent, the Chase National Bank in New York City.
34. During the years 1940-1948, inclusive, plaintiff paid dividends on its class A common and class B common stock to all holders regardless of whether they were employees or nonemployees as shown in the table below. In addition, payments under the bylaw were made to employees of plaintiff and Glenn Tobacco Company who had been employees for a year and had owned plaintiff’s class A common stock for a year, as shown in findings 30 and 32.

In addition, preferred dividends were paid in the total amount of $10,631,250 for the yeárs 1915-1925 when preferred stock was outstanding, and again during the years 1945-1948, in the total amount of $6,288,592. During each of the years 1912-1948 plaintiff paid dividends on its out *30 standing common stocks at the same rate per share to all stockholders whether or not they were employees.
35. Under bylaw xii as it was in effect during the years 1940-1948, inclusive, participating payments were made in exact proportion to the common stock owned and were out of plaintiff’s annual profits and pursuant to the formula set forth in the bylaw. The amounts so paid were in addition to fixed compensation paid the officers or employees and in addition to regular dividends paid on company stock.
There was no limitation in any of the corporate resolutions as to the amount of participating stock which any officer or employee could acquire and hold, as in the case of Lorillard, cited in finding 25. Regardless of the duties, responsibilities or services of these people they were all entitled to receive the participating payments if and when voted by the directors, based on the amount of stock held for 12 months, and provided they had been in the service continuously for one year prior thereto as provided in the bylaw.
PLAINTIFF’S STOCK ALLOTMENT POLICY
36. Plaintiff had a company policy with respect to ownership of class A common stock by employees. R. J. Reynolds, plaintiff’s founder, and his associates, felt that officers and employees “who had the interest of the company at heart” should have opportunity to acquire such common stock and participate in the profits of the company. This incentive was held out to selected officers and employees who were key people. Plaintiff did not want any individual employee to acquire an excessive amount of stock in relation to his value to the company. Prior to his death in 1918, Mr. Reynolds personally encouraged and assisted employees to purchase stock by making loans to them. In some instances he bought stock for employees and carried their loans until their payments brought the debt down to book value, at which time plaintiff took over the loans. For the most part employees bought common stock on credit. During the period 1912-1933, plaintiff extended substantial credit to employees for the purchase of stock. The loans were restricted in amount to the book value of the stock held as collateral. The year-end outstanding balances of receivables from em *31 ployees for stock purchases varied from $908,000 in 1912 to a high of about $2,975,000 in 1918, after which they gradually declined.
Some employees bought all of the stock they could and others, who had opportunity to buy, did not do so for personal reasons. Generally, the amount of stock that could or should be acquired by an employee was not discussed with him at the time he was employed.
37. Plaintiff never made any profit on sales of common stock to employees. In the case of an immediate sale, the sales price was plaintiff’s cost. In the case of a pool, the price was cost-plus-interest-less-dividends, determined on an average basis for the lots making up a pool. Stock was generally sold to employees for a price below the current market price.
Plaintiff acquired its common stock for allotment and sale to employees from various sources, including nonemployee stockholders and officers or other employees upon their death or resignation. Since 1912 none of the stock allotted to employees was original issue stock. The stock was acquired either for cash or by purchasing plaintiff’s B common stock on the New York Stock Exchange and exchanging it for common stock. Some stock was allocated and sold immediately after its acquisition. Other stock was acquired in relatively small lots over a period of time and was allotted and sold in larger blocks called “pools.” Plaintiff also influenced the allotments of large blocks of stock sold by others to employees as noted hereafter.
38. In 1933 plaintiff had on hand 100,000 shares of common stock accumulated over a period of several years for resale to employees. The cost was about $67 per share. In order to average the cost, W. N. Reynolds, James A. Gray, Bowman Gray, Sr., and S. Clay Williams, officers and directors of plaintiff, exchanged 100,000 shares of their common stock for 100,000 shares of B stock which plaintiff had acquired at a cost of $34 per share. Since A stock in the hands of the officers was of greater value per share than B stock, this share-for-share exchange represented a substantial financial sacrifice by these four officers. The resulting average cost to plaintiff of the 200,000 shares of common was $50.60 per *32 share. The continuance of the depression prevented the sale of this stock to employees even at such reduced price. These were the 200,000 shares in the retirement and insurance investment fund heretofore described.
39. Plaintiff's loans to employees for stock purchases were represented by demand notes of the employees. Plaintiff required that payments under the bylaw, regular dividends, and any other rights accruing on stock held as collateral be applied on the notes. In many instances, the loans were satisfied in full by the application of these amounts. Plaintiff did not make loans to employees to purchase B stock.
40. In 1932, because of the economic depression, stocks lost their value, money was withdrawn from banks, and plaintiff’s employees who had loans from banks other than Wachovia Bank and Trust Company, Winston-Salem, North Carolina — mainly banks outside of Winston-Salem — were being called to pay the loans. In order to aid these distressed employees, plaintiff during that year put $200,000 in certificates of deposit with Wachovia to supply Wachovia with funds to take over the employee loans called by such other banks. The loans taken over by Wachovia were taken over pursuant to designation of James A. Gray.
41. Prior to 1920, allocation of class A common stock to employees was handled primarily by R. J. Reynolds and the company treasurer. Beginning January 1, 1920, such stock allocation was handled primarily by James A. Gray who headed a stock allotment committee of three directors. When class A common stock was available for sale to employees the usual procedure was to send letters to department managers, superintendents and other supervisory people requesting the names of employees they could recommend as having “the interest of the company at heart” and the amount of stock each such employee wished to purchase. The data so gathered were assembled and reviewed by the committee which made the final decision regarding the allotment. It was the desire of plaintiff that class A common stock should not be acquired without the approval of management. But, there was no corporate resolution concerning the manner or method under which acquisition could or would be made and no express directions to employees as to the amount of *33 stock which they could acquire. The view of the management that it should approve common stock acquisitions by employees was passed by word of mouth on an informal basis. Plaintiff’s management sometimes reprimanded employees who had acquired such stock without approval and warned them not to let it happen again. However, no employee was ever discharged for acquiring too much stock. Employees sometimes acquired class A stock by gift, exchange, inheritance or purchase from other employees and holders of the stock, without advance notice to the company. Shares were traded on the New York Stock Exchange. Between 1922 and 1948 a total of 89,475 class A common shares were so traded at a rate which varied annually from 630 to 9,070 shares. From 1940 through 1948, 32,418 shares were traded on the New York Exchange. There is no evidence that all of the purchasers were plaintiff’s employees. As indicated in finding 37, stock was sometimes acquired by plaintiff’s employees from directors and estates of plaintiff’s directors. From 1940 through 1948 the total number of shares involved in this type of transaction was 105,248. To the extent that the company had control over the allocation of stock acquired through trusts or estates, it generally took into consideration, in making allocations, ability, present and potential interest, loyalty and sometimes length of service of employees. Existing common stockholdings of an employee were also considered. Mr. Gray and his committee were concerned, also, to assure that participation of existing employee stockholders was not adversely affected by the acquisition and distribution of shares among employees.
On one occasion plaintiff acquired a large block of stock from the Baltimore Safe Deposit and Trust Company, trustee of the estate of one of plaintiff’s deceased officials. In the case of this stock, all shareholding employees were given the same rights with respect to acquiring it, namely one share for each three shares held and, ultimately, new employees and other employees not holding stock were offered small holdings. Because of the economic depression of the 1930’s about 29,000 shares of stock were defaulted by employees who had bought it on credit. The defaulted *34 stock was reallotted and when not sold was set up in a special account.
After 1935, because of regulations of the Securities and Exchange Commission, plaintiff did not itself acquire and sell stock to its employees. However, stock acquisitions continued to be reviewed by the above referred to committee at least through 1948.
42. Banks made more loans to employees for the purchase of stock than did plaintiff, and plaintiff encouraged its employees to borrow from their own banks for this purpose. Wachovia Bank made loans in large volume to employees to finance purchases of plaintiff’s common stock. The amount of such loans by Wachovia was far in excess of the amount loaned by all other Winston-Salem banks. At one time the outstanding loans made by Wachovia were between $5,000,-000 and $6,000,000. Wachovia, like plaintiff, required that the payments under the bylaw be applied on the loans. Stock which was sold to employees out of the estates handled by the Wachovia Bank and Trust Company was sold for the best price which the bank could secure, usually prices as listed on the New York Stock Exchange. Generally, fair market prices were charged for all stock.
43. When an employee of plaintiff went to Wachovia to apply for a loan to purchase common stock the bank obtained information about his salary, dividends and payments under the bylaw. It was important for the bank to know whether the stock was in line for participation from the seller and to determine whether the buyer had the required time with the company and was entitled to participate, as the common stock selling between the two would clear a higher price than the general market for the stock. Wachovia officials maintained a close contact with plaintiff’s management on these matters and thus plaintiff was informed of all sales and purchases of its stock when Wachovia was the purchaser or seller or was making loans for purchase to plaintiff’s employees. Sometimes the bank would discourage or reject an otherwise qualified borrower when plaintiff indicated the employee was getting out of line on his stock compared to his responsibilities. Wachovia Bank was executor of numerous estates of deceased officials and other employees of *35 plaintiff and disposed of various amounts of common stock owned by these estates. In selling this stock the bank cooperated closely with plaintiff along the lines indicated above and sometimes sold the stock to employees on a list compiled by plaintiff’s management. It is not shown by the evidence whether other banks from which employees obtained loans to buy stock cooperated with plaintiff’s management as did Wachovia.
44. The number of individuals participating under the bylaw was 27 for the year 1912, eight of whom were directors of plaintiff. Thereafter, the number of participants increased almost every year through 1928, the greatest increase occurring in the period from 1921 through 1928, during which the number increased from 308 in 1921 to 2,177 in 1928, which marked the largest number of individuals ever to participate under the bylaw. The number of participants dropped off in the early 1930’s and gradually increased back to slightly more than 2,000 by 1937 and remained practically static through 1941. The amount of participating common stock owned by employees followed to a large degree the same pattern as the number of participants. The number of shares participating for 1912 was 191,400. By 1920, the number had increased to 250,490, by 1928 to 850,037, the largest number of shares ever to participate. Thereafter, the number of shares gradually declined. The percentage of total participation payments going to the directors almost constantly declined from 1912 through 1948, and for the years in question it declined from 36.60 percent in 1940 to 21.92 percent in 1948. The number of employees of Glenn Tobacco Company participating under the bylaw varied from a low of eight for 1923 to a high of 23 for 1929 and 1931. In the period 1922-1948, the number of participating shares owned by Glenn employees varied from a low of 1,912 in 1924 to a high of 11,017 in 1939.
45. The following is a summary for each of the years 1940-1948 showing the categories of employment of the participating employees, the number of individuals, the number of participating shares, the dollar amount of participation paid, the fixed compensation, and the total fixed compensation and participation:

*36

*37

*38

*39 46. For each, of the years 1940 to 1948, inclusive, all of the officers and directors of plaintiff were full-time employees and were participants under the bylaw, with the exception of R. J. Reynolds, Jr., who was a director from May 1942 until plaintiff’s annual meeting in 1947.
47. The following schedules set out for each of the years 1948, 1947 and 1948 [1] data with respect to the number of regular employees (excluding officers and directors, but including Glenn employees) participating under the bylaw, broken down by fixed compensation brackets, on the payroll at the end of the year:

*40

48. During the years 1940-1948, 80 to 100 percent of plaintiff’s leaf tobacco buyers owned common stock. During these years, 78 to 98 percent of the sales division managers and assistants owned participating stock. Thirty-six to 58 percent of the salesmen, excluding those in the Armed Forces, owned such stock.
*41 IMPERFECTIONS IN OPERATION OF BYLAW
49. Plaintiff’s plan for employee participation in profits was unique when started in 1912. It was different from the plans of competitors where only top officials participated. Over the years, however, two imperfections developed in the plan. Some employees did not acquire as much stock as was appropriate and some got too much. Some employees simply could not, for personal reasons, invest money in the stock to the extent that their positions and records would have entitled them in the management’s view. On the other hand, some employees purchased stock or acquired it by gift or inheritance out of all proportion to their value to the company. Their bylaw payments thus were greater than they should have been and their total compensation was excessive in relation to other employees in generally similar categories of employment or even to other employees in higher employment classifications. Sometimes excessive stock ownership came about as a result of the company having encouraged ownership by an individual whose prospects of future value to the company were misjudged and sometimes by purchases without management approval, as heretofore noted. It was the view of plaintiff’s management, however, that the defects in the plan as described above did not affect the overall success of the plan through the years and, further, that excessive acquisitions did not cost plaintiff anything since a specified percentage of profits was paid to participants, whoever they might be.
50. The following tabulation shows for each of the years 1940-1948 the amount of the bylaw payments which, when added to fixed compensation, plaintiff admits exceeded a reasonable allowance for personal services rendered by the individual recipients. The tabulation also shows the total payments under the bylaw, the total fixed compensation plus bylaw payments of participating employees, and the percentage of the excessive bylaw payments to the latter.

*42

51.Tbe tabulation below shows for each of the years 1940-1948 the number of employees plaintiff admits received excessive bylaw payments as stated in the finding above, the total number of employees participating under the bylaw, and the percentage of the former to the latter:

plaintiff’s business record
52. In 1912 plaintiff was the smallest of the four principal tobacco companies that emerged from the dissolution of the American Tobacco Trust. In assets and sales it was about one-third as large as Lorillard and less than one-fourth the size of Liggett. Plaintiff had about one-fifth the sales and one-twelfth the assets of American.
53. The increases in capital and surplus of the four companies by 1948, compared with 1912, were as follows:

*43

54. During the years 1940-1948, plaintiff paid out a greater percentage of its equity capital in the form of dividends (on common and preferred stocks) than did American, Liggett or Lorillard, except in the case of Liggett for 1948.
55. The increases in net sales of the four companies by 1948, compared with 1912, were as follows:

56.The following tabulation shows the net sales of the four companies for each of the years 1940-1948:

*44 57.The equity capital figures of the four companies for the years 1940-1948 [2] were as follows:

58.The following tabulation shows the earnings before taxes on income of the four companies for the years 1940-1948:

59.The following tabulation shows the percentages of earnings before taxes to net sales of the four companies for the years 1940-1948:

*45 60.The following tabulation shows the percentages of earnings before taxes to equity capital (capital stock and surplus) of the four companies for the years 1940-1948:

61. In World War II leaf tobacco was under allocation. Annual quotas were fixed or allotted on the basis of previous usage of tobacco from inventory. Plaintiff decided not to sacrifice quality for quantity by removing from inventory leaf which was not properly aged and matured. This policy depressed the quotas allotted to plaintiff and adversely affected its volume of sales and earnings.
62. During the many years following the adoption of bylaw xix, the operation of the plan thereunder materially aided the progress and development of plaintiff. On June 29, 1949, however, an amendment was adopted which gradually decreases the percentage of profits available for distribution so that it will be a nullity by 1959. The management decided to abandon the plan due to the very high rates of income tax and on account of restrictions on borrowing for the purchase of listed stocks which made it difficult for newer employees, lacking outside resources, to acquire stock in sufficient quantities for the bylaw to serve as an incentive to them.
63. The ownership of A common stock by plaintiff’s employees had a more stimulating and beneficial effect on them than ownership of B stock. This effect came about as a result of the fact that class A common carried both a regular dividend and bylaw participation payments while B stock paid only the regular dividend. Nothing in the foregoing findings, however, should be construed to mean that *46 the only loyal and efficient employees of plaintiff were holders of class A common stock. It is a fact that, as a general rule, the plaintiff’s employees were a loyal working force whether they owned stock or not. Such ownership, however, was an incentive to efficiency and cost consciousness. Plaintiff’s purchasing force was very efficient in that it sometimes purchased various grades of tobacco at prices lower than competing companies. Evidence indicates the efficiency of plaintiff’s manufacturing processes as well.[3] Plaintiff’s sales force and its management as a whole were considered equally efficient.
64. During the years 1946-1948 (data for earlier years being unavailable) employment turnover was substantially lower among employees participating under the bylaw than among nonparticipants. The comparative rates of turnover as between participating employees and nonparticipating employees, based on separations due to dismissals and resignations, were as follows:

FURTHER INDICIA OF NATURE OF BYLAW PAYMENTS
65. As noted in finding 36, the payments under the bylaw were not generally discussed with new or prospective employees. No representations were made to them as to whether they could buy common stock. Knowledge of the bylaw, however, was soon acquired by employees and even by prospective employees. When known, it was an encouragement to these people to try to become associated *47 with plaintiff and when employees acquired common stock it was an inducement for them to stay with plaintiff. Employees sometimes referred to such payments as a “bonus.”
66. Fixed salaries and hourly wages paid to plaintiff’s employees on the levels below directors, officers and junior officers, such key employees as plant, department and division managers, and superintendents were at the going rate in the community. Salaried employees did not have fixed salaries larger than comparable positions in the next four or five largest companies in Winston-Salem. In some cases they were lower for the years 1940-1948. This was the view of the employees themselves. Plaintiff made no direct comparison of salaries below officers and directors to those paid by other corporations for comparable jobs. It is a fact, however, that plaintiff paid its buyers lower fixed salaries than some competitors. In 1946 the fixed salaries of plaintiff’s salesmen were low and their starting salaries were lower than competitors’. Salesmen were encouraged to buy common stock to help increase their earnings. While plaintiff sometimes found the situation “tight” it was able to secure the necessary help. Some employees were so much in debt they could not have left the company. In addition to bylaw payments plaintiff had a policy of granting periodic pay raises to its employees as well as raises for meritorious service. When plaintiff gave across-the-board increases to hourly workers it likewise gave raises to supervisory personnel. Plaintiff also maintained for the benefit of its employees a retirement plan, a group life, health and accident insurance plan, and hospitalization and vacation plans.
67. Annually the plaintiff’s comptroller made a preliminary determination of the annual profits which he submitted to the board which in turn fixed a specified dollar amount per share to stockholders after the treasurer read aloud to the board a complete list of all participants for the year. The resolution of the board for the years 1940-1945 referred to the participation payments under the bylaw as a “participating dividend” and found that “if such distribution were to be tested upon the basis of reasonable and proper compensation for those receiving same, it, with salary added, would *48 not amount to more than a reasonable and proper compen sation to each of said officers and employees for the year.’
For the years 1946-1948, the resolution was substantially the same except that the finding with respect to reasonableness was that the distribution “will be reasonable and proper under said By-Law and will serve the purposes and intention thereof.”
68. During the two World Wars and following World War II, the board of directors, as noted in finding 28, expressly provided for the continuation of participation payments under the bylaw to employee stockholders in the military services. This provision was part of a general plan to continue employee benefits, such as family hospitalization and group life insurance.
69. During the period 1940-1948 plaintiff in three instances made long-term borrowings, totaling $150,000,000, in the form of two promissory notes and one issue of debentures. In each of the instruments evidencing the borrowings there was a covenant restricting the payment of dividends by plaintiff on its common stocks under stated conditions. None of plaintiff’s short-term notes contained such a restriction. The restrictive covenant in the long-term notes and indenture provided:
Payments to employees (including officers) of the Company or any Subsidiary pursuant to any profit-sharing plan, including the Plan provided for in Article xn of the By-Laws of the Company, although such payments are made on the basis of or proportionate to shares of stock of the Company owned by such employees, shall not be deemed dividends for the purposes hereof.
70. Plaintiff first claimed in this suit that the following amounts of participation payments made under article xii of its bylaws, are deductible in computing its taxable income, for the years 1940 to 1948, inclusive, and in determining income and excess-profits tax liability for those years. The amounts below are now modified by plaintiff’s admission of excessive payments to the extent shown in finding 50.

*49
Year Amount

1940___$1, 922, 382. 25
1941--1, 936, 998. 42
1942_ 1, 435, 249. 20
1943- 1, 330, 634 27
1944_ 1, 200, 631. 05
1945- 1, 305, 726. 75
1946_ 1, 925, 734. 81
1947- 2, 191, 694 45
1948___ 2, 370, 103. 96
For convenience, the bylaw payments -which plaintiff now says are reasonable, considering the admission, are as follows:

71. By letter dated August 18, 1949, plaintiff applied to the Commissioner of Internal Revenue for a ruling as to whether payments under the bylaw as amended June 29, 1949, constituted a deductible expense. It was stated that, principally, the amended bylaw was different from the former bylaw in three respects, as follows:
(1) Whereas under the former by-law, the maximum percentage of profits above the base amount which could be paid was 10%, under the amended by-law, the percentage is reduced to 9% for 1950, 8% for 1951, and so on down to 1% for 1958, and none thereafter;
(2) Whereas under the former by-law, a qualified employee could participate with respect to’ any common stock owned by him for at least a year, under the amended by-law common stock eligible for participation is limited to common stock owned throughout 1949 by officers and employees of plaintiff or its wholly-owned subsidiary and such other common stock as was owned by such officers and employees on May 24, 1949; and
*50 (3) Whereas under the former by-law, the per-share participation was increased by a reduction in the number of participating shares, under the amended by-law such an increase is precluded in the case of a decrease in the number of shares which participated for 1949.
72. By letter dated December 28, 1949, the Deputy Commissioner of Internal Revenue ruled that the payments pursuant to the amended bylaw would constitute “compensation for personal services rendered” and would therefore be deductible to the extent reasonable. On March 13, 1950, plaintiff filed the claims for refund, covering the years 1940-1948, which constitute the basis of this suit.
73. By letter dated November 13, 1951, the Deputy Commissioner of Internal Revenue revoked his 1949 ruling on the express ground that the changes in the bylaw effected by the 1949 amendment “were not material to the question presented.”
74. On December 20, 1951, the Internal Revenue Service forwarded to plaintiff the report of the revenue agent on the claims for refund. In the Findings and Recommendations on page 11 of his report, the agent recommended disallowance of the claims for refund on the express ground that there was no material difference between the original bylaw and the bylaw as amended in 1949, that plaintiff had conceded this, and, therefore, the deductibility issue was governed by the 1951 letter revoking the 1949 ruling.
75. During the years 1940 to 1948, inclusive, plaintiff accrued on its books monthly an estimated portion of the expected year-end distribution under the bylaw by crediting such estimate to an account Provision for Participation by Officers and Employees in Certain Profits, and debiting an account Participation by Officers and Employees in Certain Profits. As of the end of each year, the total of the estimated monthly amounts was adjusted to the actual amount of the payment to be made under the bylaw and charged against income (Income Account) for the year. Following the close of each year, when disbursements were made of the payments under the bylaw, these amounts were charged against Provision for Participation by Officers and Employees in Certain Profits.
*51 76. For tbe years 1936, 1937, 1938, and 1939, plaintiff, in computing its undistributed profits surtaxes, treated tbe participating payments as dividends. Plaintiff was allowed dividends paid credits of two and one-balf percent of the participating payments on tbe claim that they were dividends and thus realized substantial tax benefits in those years through such treatment. This treatment of the payments was in line with the determination of a revenue agent. Plaintiff also did not deduct the participating payments as compensation or otherwise in its State income tax returns.
77. Plaintiff deducted the bylaw participation payments in arriving at book income or net income as reported to stockholders and to the Securities and Exchange Commission in its form 10-K reports. The tax return required a reconcilement of book income with taxable income, and since the Government’s position was that the participation payments were not deductible for tax purposes, it was necessary to show these payments as some form of nondeductible item on the tax return in making this reconciliation. Sometimes they were shown as participating dividends, as distribution to stockholders and as an addition to surplus reserves. By and large they were shown as unallowable deductions or nondeductible items on the tax returns. Payments were deducted as one figure in arriving at net earnings and were not distributed or allocated to cost of goods sold or to any other item of cost.
78. Independent auditors, Ernst and Ernst, approved plaintiff’s bookkeeping treatment of the bylaw payments and the treatment in the annual reports to stockholders, certifying that such treatment was “in conformity with generally accepted accounting principles.” With respect to plaintiff’s different treatment of the bylaw payments for tax purposes, the auditors, during the 1930’s, raised the question a number of times with plaintiff’s management as to why the payments were not deducted and were told that it was because of a ruling of the Internal Kevenue Bureau to the effect that the payments were not deductible.
79. In each of the forms 10-K filed with the Securities and Exchange Commission, pursuant to law, for the years 1946 to 1948, inclusive, plaintiff gave the following answer to the following question:
*52 Q. State the name of and the amount received by each person who received as bonuses or shares in profits $30,000, or more, from the registrant or its wholly-owned subsidiaries, during the fiscal year.
A. Outside of salaries and wages paid and actual expenses reimbursed, no payment is made to any director, officer or employee of the company except dividends and disbursements in connection with his stockholdings in the company declared by the Board of Directors as ordinary dividends or under Article xii of the Company’s By-Laws.
In forms 10-K for 1944 and 1945, the question was the same and the answer similar, the only substantial difference being that the words “disbursement or credit” were used in place of “payment” in the answer.
80. Plaintiff's retirement plans, adopted in 1929 and 1946, defined the terms “wage” and “compensation” so as to exclude bylaw payments for purposes of computing pensions. The 1929 plan excluded the payments in the following terms:
* * * (not including any amounts received as participation in profits of the Company on account of stock ownership therein) * * *.
The 1946 plan provided as follows:
“Compensation” means the total earnings, as determined by the Retirement Board, paid for service, as defined herein, excluding (a) any amounts received as participation in profits of the Company, whether on account of ownership of stock or otherwise, and (b) any amounts paid for insurance or other benefits, including benefits under the Plan.
81. By letter dated December 18, 1942, S. Clay Williams, at that time chairman of plaintiff’s board, applied to the Commissioner of Internal Revenue for a ruling as to whether the bylaw payments could be made without violating the salary stabilization laws and regulations, for, if the payments under the bylaw were to be regarded as an additional salary or bonus instead of as a dividend, certain officers of the company would receive amounts in excess of the amounts allowable under the act. The application stated in part as follows: .
*53 Historically, tbe Bureau has beld tbrougbout the period of federal income taxes that the disbursements made under this particular by-law are dividends. This ruling has been consistently applied in the matter of income taxes, excess profits taxes, war profits taxes and undistributed profits taxes affecting the corporation, with the result, of course, that it has not been permitted to deduct such disbursements as expense items in arriving at taxable income and has been instructed to treat same as dividends in connection with the calculation of undistributed profits taxes.
82. On December 31, 1942, the Commissioner of Internal Revenue replied to the plaintiff, stating in part as follows:
The special dividends paid or to be paid on the common stock of your company, to your employees who own stock in your company, as described in your letter, and as provided in your bylaws, are preferential dividends, and not bonuses or additional compensation within the meaning of the General Regulations and the Salary Stabilization Regulations, copies of which are enclosed.
83. In each of the years 1940 to 1948, inclusive, the amounts of the participation payments were not treated as compensation by the plaintiff in computing its social security and withholding taxes, both Federal and State.
84. The participation payments to employees of Glenn Tobacco Company were not charged to Glenn nor were they recorded as part of the cost to plaintiff of imported tobaccos which Glenn purchased for and sold to plaintiff.
85. In accordance with Federal and State taxing policies, some of plaintiff’s key officers and directors treated the participation payments as dividends in filing their State and Federal income tax returns and did not treat them as compensation or bonuses. They thus secured tax benefits in so reporting their income to the State of North Carolina, inasmuch as dividends were not taxable in North Carolina in full or to the same extent as compensation.
86. In 1940 certain class B common stockholders brought a complaint in the Chancery Court of New Jersey against R. J. Reynolds Tobacco Company, et al., the same being amended in 1943, and alleging that the company and its officers had willfully or negligently wasted corporate assets by *54 failing to deduct the bylaw payments, as an expense of the operation of the corporation business, for income tax purposes. It was alleged that, as a result of the foregoing, certain directors had profited personally in treating the payments as dividends and that the corporation sustained a loss resulting from excessive State and Federal income taxes.
87. In answer to the allegations specified in the preceding finding, Reynolds said that the participation payments were not deductible as expenses in determining income under State and Federal laws. It was admitted that those who had received payments under the bylaw had treated them for income tax purposes as dividends. It was further alleged, among other things, that the distributions in question were lawful incentives for services and were not in misuse or waste of the corporate property.
88. In its decision reported in the case of Arthur Bookman, et al., v. R. J. Reynolds Tobacco Company, et al., 138 N. J. Eq. 312, 48 A. 2d 646, the Chancery Court of New Jersey held for the defendant on the issues raised in the case.
REASONABLENESS OE BYLAW PAYMENTS
89. American, Liggett, Lorillard and plaintiff were all engaged in the tobacco business. They bought leaf tobacco on the same auction markets in competition with each other. They aged and cured the leaf tobacco. They processed or manufactured the tobacco into the finished products, using similar machinery. They were predominantly cigarette manufacturing companies. They used generally similar sales methods, covering the same sales markets and selling to the same dealers. All were in “fierce” competition with each other.
90. The following tabulations show for each of the four companies the total payments (fixed salaries and profit-sharing payments) of the individual officers and directors of plaintiff, American, Liggett and Lorillard, and in the case of plaintiff the fixed salaries of each of the officers and directors, and the totals paid by each company to its officer-director group:

*55

*56

*57

*58 1948 Reynolds Fixed salary Total payments American Liggett Lorillard 1. 2.. 3. 4. 5. 6. 7. 8. 9. 10.. 11.. 12.. 13.. 14.. 15. 16.. 17.. 18.. Others not listed. $100,000 62.500 19.500 50,000 41.500 32.500 15,200 43.500 13.500 17.500 27,000 32.500 24,000 17,000 26,000 9,900 11,900 3,028 $179,220 179,000 112,700 92,173 71,557 60,926 49,218 44,432 44,256 43,130 34,922 32,500 31,107 26,786 26,559 17,542 17,492 3,028 $447,805 246,712 246,712 246,712 246,712 120,074 87,865 50,074 50,074 50,074 50,074 40,074 40,074 35,074 35,074 30,074 29,484 27,074 30,903 $133,730 123.730 123.730 120.731 120,731 118,730 55,000 55,000 55,000 29,917 29,000 $85,144 65,115 51,086 51,086 51,086 33.460 29,860 28,960 28.460 27.461 22,500 * 122,300 Total. 547,028 1,066,548 2,110,719 987,799 574,018
91. The following tabulation shows for each of the years 1940-1948 a comparison of the total payments to plaintiff’s officer-director group with the average of the total payments made by American and Liggett to their respective officer-director groups:

92. The following tabulation shows for the years 1940-1948 the percentage of total compensation (including bylaw payments) of the officer-director group to net sales for each of the four companies:

*59

93.The following tabulation shows for the years 1940-1948 the percentage of total compensation (including bylaw payments) of the officer-director group to earnings before taxes for each of the four companies:

94.Participating payments to plaintiff’s executive officers during the years 1940 to 1948, inclusive, for convenience restated from the table in finding 45, are as follows:

95.The chief executive and most important officer of plaintiff was the chairman of its board who “was the man in the driver’s seat” and in charge of all operations. For all *60 of the years 1940 through 1948 S. Clay Williams was chairman of the board. Pertinent data about his compensation for the years involved follow:

It is found from the evidence that the total compensation plaintiff paid to Mr. Williams was not based purely upon the extent of the services he rendered but that it fluctuated depending upon plaintiff’s annual profits and the amount of participating stock he owned.
96. In the classification of officers and directors, as used in stipulated exhibits 22 to 30, the following officers of plaintiff were included in addition to the chairman of the board for all years 1940 to 1948, inclusive: president, three or more vice presidents, treasurer, and secretary. For some of these years there were included in this classification the chairman of the executive committee, purchasing agent, manager sales department, counsel, assistant counsel, traffic manager, superintendent leaf processing, leaf supervisor, general leaf superintendent, associate counsel, manager advertising department, comptroller and assistant sales manager.
Of the officers stated above, the most important, other than the chairman of the board, were the president and chairman of the executive committee. The duties and responsibilities of the various vice presidents were similar and their jobs were somewhat comparable. Length of service, however, was considered important in evaluation of their services.
97. The evidence does not disclose in detail the duties of all of the various officers listed above, their exact responsibilities, nor the reasonable value of their individual services. There is insufficient evidence in the record from which the value of the services of these individual officers and directors can be determined with any reasonable degree of certainty. *61 The evidence of salaries paid officers and directors of other tobacco companies, for comparative purposes, is insufficient to determine with any degree of certainty the reasonableness of salary or compensation of the various individual officers and directors of plaintiff for any of the years 1940 to 1948, inclusive. The evidence does not show the nature, value, or extent of the services of all of the officers and directors of the other major companies; does not disclose the weight that should be given to stockholdings as distinguished from pure services; and does not sufficiently show the duties of the various officers and directors in each of the categories of plaintiff, or of other companies, or the corresponding duties and services of the particular officers and directors in other tobacco companies to the executives of plaintiff. The evidence also does not disclose whether the officers and directors in other tobacco companies, holding corresponding or similar titles to the officers and directors here involved, performed services similar or comparable to any executive officer of plaintiff. The evidence does show that the participation or bonus plans of the various tobacco companies were not comparable to the participation plan here.
98. As a further indication that the total compensation paid to the various officers and directors was not wholly commensurate with services or based purely upon services without regard to stock ownership, it is found that the total compensation for most of the years here concerned was less for the board chairman than for the president of the plaintiff. During much of the period from 1940-1948, however, Mr. Williams was in Washington, D. C., doing Government work of various kinds and his duties as chairman of the board devolved upon Mr. Gray, the president, during these absences. The fixed salary of the president was only half that of the chairman of the board, but in each year he owned considerably more .participating stock and received far greater payments under the bylaw.
Further, though the duties and responsibilities of the vice presidents were comparable, K. E. Lasater, a vice president, received a total compensation higher than that of two other vice presidents. Mr. Lasater was senior in service but, except for the year 1940, his fixed salary was less than that of *62 either of the other two vice presidents. He owned more participating stock and, as with other officials and employees who owned stock, total compensation depended upon such ownership and plaintiff’s profits.
ultimate findings
99. The bylaw was set up to provide a plan for profit participation as an incentive to employees. However, the evidence establishes that the effect of the operation of this bylaw from 1940 to 1948, inclusive, was to reward employees, who held class A common stock, with payments from annual profits in large part because of their investment in such stock and not purely for services.
100. The evidence does not disclose the employees who purchased stock without company approval or received it as a gift or inheritance nor the number of shares of stock thus obtained by those employees without company approval.
101. It cannot be determined from the evidence that the bylaw payments, if considered as compensation for personal services, were, together with fixed salaries, reasonable as to each and every individual officer and employee for the years 1940 to 1948, inclusive.[4]
*63 102. The evidence does not establish that the participation payments under the bylaw for the years 1940 to 1948, inclusive, to plaintiff’s officers and employees, were otherwise ordinary and necessary business expenses to any extent, or includible as a part of the cost of goods sold, or that any particular amount of these payments was so includible.
103. It is found from the evidence that no part of the bylaw participation payments to employees of Glenn Tobacco Company represented costs of plaintiff’s goods sold, or reasonable compensation, or ordinary and necessary business expenses.
CONCLUSION OB’ LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Data for prior years not in existence at the time of the trial of this case.

 B eginning of year.

 Studies made by tibe Brown & Williamson Tobacco Corporation, a competitor of plaintiff, revealed to its satisfaction that plaintiff's cost of manufacturing cigarettes was three to five cents lower per thousand than that of its competitors. These studies were not based on exact figures of the other companies due to the Impossibility of obtaining such figures; however, the results were considered sufficiently reliable by the Brown & Williamson Tobacco Corporation “to impress upon our own manufacturing people."

 Four of plaintiff's executives testified that previous to the trial they reviewed the records of all employees who participated in the bylaw distributions during the period in question. The result of the review was a determination of reasonable compensation, or partially reasonable and partially unreasonable compensation for each employee and a statement of the amount considered unreasonable where such was the case. These four witnesses then testified that, except for the payments they deemed unreasonable, all other payments under the bylaw, when added to the particular employee’s fixed compensation, did not constitute unreasonable compensation. In making their examinations, the four executives took into consideration the usual factors that enter into an appraisal of the value of an employee’s services including his salary and bylaw participation, ability, performance in the Job, responsibility, and length of service.
The former president of a competitor testified that the aggregate amount of fixed compensation plus bylaw payments paid to the officer-director group of plaintiff as a whole was not unreasonable compensation. However, there was no direct comparision of plaintiff’s officer-director group with the officer-director group of competitors by showing comparative duties, responsibilities, etc., of the individual officers or directors. This testimony of reasonableness was based solely on a comparison of the total wages paid to the officer-director group of the respective companies in proportion to sales and earnings of those companies.
The Government introduced no evidence to refute the testimony of the above witnesses as to reasonableness and introduced no evidence to prove unreasonable compensation.
It is felt, however, that the above testimony of plaintiff's executives is insufficient to prove reasonableness of the employees’ compensation and that the testimony as to the officer-director group is insufficient to prove the reasonableness of the total compensation paid to any individual officer or director.